## THE OCEAN CITY ASSOCIATION, PLAINTIFF IN ERROR, v. WILLIAM SHRIVER, DEFENDANT IN ERROR.

Argued March 22 and 23, 1900—Decided June 18, 1900.

The Ocean City Association, an incorporated land company, in 1880, pur-- chased a tract of several thousand acres of wholly unimproved land,. lying between Peck's Beach and the Atlantic ocean. Shortly after the purchase the association made and filed a map, on which lots and streets were laid out. In 1883 it caused a more extensive map to be made, which was lithographed, and a copy filed in the county clerk's office. On the map of 1883 Ocean avenue was delineated par-- allel with and some distance from the ocean, and streets were laid out,. extending from Ocean avenue westerly, among which Sixth, Seventh, Eighth and Ninth streets are material to this case. On this map Ocean avenue was shown as extending down to Fourteenth street, crossing Eighth, Ninth and Tenth streets, and the line of high water was delineated, as of 1882, two hundred and fifty feet east from the easterly line of Ocean avenue. Between that line and Ocean avenue appeared a space of unplotted land, which had not been laid out into lots for sale. By a deed dated October 29th, 1884, the association con- veyed lot No. 849 to one Henry B. Howell. The map referred to was the sales map of 1883. Lot No. 849 was on the westerly side of Ocean avenue, between Eighth and Ninth streets. It had between it and the Atlantic ocean, Ocean avenue, and also the strip of unimproved or unplotted land between that avenue and the ocean. The deed con- tained a description by metes and bounds. Howell, by a deed dated April 21st, 1895, conveyed this lot to Shriver, the defendant in this suit, by the same description by metes and bounds—that is, of a lot on the northwesterly side of Ocean avenue. The controversy in this case relates to the title of a strip of land fifty feet in width, lying between the extended lines of the lateral boundaries of lot No. 849, and ex- tending from the westerly side of Ocean avenue easterly about one hundred and fifty feet. It is within the lines of the riparian grant hereinafter mentioned. It appeared in evidence that after 1880 the ocean gradually worked inland, carrying away the avenue, or part of it, in front of lot No. 849, and that in 1895 the ordinary high water came up to this lot. In 1897 the ocean began to recede, and the map of the riparian commissioners indicates a high-water line in Ocean avenue. On August 3d, 1897, Shriver obtained a grant from the ripa-- rian commissioners covering in terms a strip of land fifty feet in width between the extended lines of the lateral boundaries of lot No. 849,.

from the high-water line as indicated by the commissioners to the exterior line, a distance of nine hundred and eighty-five feet. Both parties claim title by accretion. *Held*—

1. That to entitle a proprietor to the right of accretion, he must be a riparian owner, and his land must adjoin the line of ordinary high tide. If a strip of land, however small, intervene between the premises and the water at ordinary high tide, its owner will not be entitled to the accretion.

2. The right to alluvion depends upon the fact of the contiguity of the estate to the water, and to give a right to accession and accretion there must be an estate to which the accession can attach.

3. The doctrine whereby title is acquired by accretion is founded on the principle of compensation. The proprietor of lands having a boundary on the sea is obliged to accept the alteration of his boundary by the changes to which the shore is subject. He is subject to loss by the same means that may add to his territory; and, as he is without remedy for his loss, so he is entitled to the gain which may arise from alluvial deposits.

4. As between vendor and vendee, the right to alluvion depends upon the condition of the land at the time of the transfer of the legal title.

5. As between the association and Howell, the line of ordinary high water in 1884, which is the date of his deed, determines the right to accretion as between those parties. Shriver, by his deed from Howell in 1895, could not, as against the association, acquire any title or estate or right beyond that which the association, by its deed in 1884, conveyed to Howell.

6. The defendant's grant by the riparian commissioners was made pursuant to the act of 1871. *Gen. Stat.*, p. 2790. That act empowers the riparian commissioners to make grants of the lands under water to riparian owners only, and a grant by the commissioners under that act to anyone else would be *ultra vires.* The case, therefore, between these parties turns wholly on the condition of the line of ordinary high tide in 1884. If, as between the association and Howell, the line of ordinary high tide was not such that Howell became a riparian owner, then Shriver, by the changes in the shore, did not become the owner of the accretion, and the grant of the riparian commissioners, in 1897, was a nullity.

7. An instruction by the trial judge that if the high-water line before or in 1895 advanced to or on the lot No. 849, that lot became a riparian lot, and whatever alluvial increase the ocean had in its advance brought to and in front of the lot became the land of the defendant, was erroneous.

On error to the Supreme Court.

This case was tried at the Atlantic Circuit and resulted in a verdict for the defendant, and is here on exceptions to the judge's charge.   The facts will be stated in the opinion.

For the plaintiff in error, *David J. Pancoast.*

For the defendant in error, *Albert A. Howell, Samuel W. Beldon* and *Samuel H. Grey.*

The opinion of the court was delivered by

DEPUE, CHIEF JUSTICE.    This was an action of ejectment brought by the Ocean City Association against William Shriver to recover possession of a lot of land in Ocean City, lying between Ocean avenue and the Atlantic ocean.

The Ocean City Association is an incorporated land company.   In 1880 it purchased a tract containing several thousand acres of wholly unimproved land lying between Peck's Beach, in the county of Cape May, and the Atlantic ocean. On this tract a summer resort known as Ocean City has grown up.

Shortly after the purchase the association had a map made from a survey made by one Lake.   The map was lithographed and a copy filed in the office of the clerk of Cape May county, and some lots were sold by the association by reference to it.   In 1883 the association caused a more extensive map or plan to be made by Lake, which was lithographed and a copy also filed in the clerk's office.   By the map of 1880 it appeared that there was a considerable space of undivided land lying between that portion of the association's property and the Atlantic ocean.   On this map Ocean avenue was delineated practically parallel with and some distance from the ocean.   Streets were delineated extending from Ocean avenue westerly, among which Sixth, Seventh, Eighth and Ninth streets only are material to this case.   On the map of 1880 Ocean avenue was delineated only as far as Eighth street.   The premises which have given occasion to this litigation front on Ocean avenue and lie between Eighth

and Ninth streets. On the map of 1883 Ocean avenue is delineated as extending beyond Eighth street, down to Four-teenth street, crossing Eighth, Ninth and Tenth streets and the other streets below. On that map is delineated a line of high water in 1882. That high-water line is located about two hundred and fifty feet east of the easterly line of Ocean avenue, and between that line and Ocean avenue appears a space of unplotted land—land which had not been laid out in lots for sale. This map was used as the sales map.

By a deed bearing date October 29th, 1884, the association conveyed lot No. 849 to one Henry B. Howell. This lot was on the westerly side of Ocean avenue, between Ninth and Tenth streets. It had between it and the Atlantic Ocean, Ocean avenue, and also the strip of unimproved or unplotted land between that avenue and the ocean. The description of the premises conveyed to Howell is as follows: "All that certain lot or piece of ground situate, lying and being in Ocean City, on Peck's Beach, Upper Cape May township, Cape May county, State of New Jersey, and numbered 849 in section C on the plan of lots of the said 'Ocean City Association.' Beginning on the northwesterly side of Ocean avenue, at the distance of one hundred and fifty feet southwesterly from the southwesterly line of Ninth street, containing in front or breadth on the said Ocean avenue fifty feet, and of that width extending northwesterly between lines parallel with the said Ninth street, one hundred and thirty-five feet, to a fifteen-feet-wide street." It is manifest from this description that the sale to Howell was made by reference to the map of 1883. Howell, by a deed dated April 21st, 1895, conveyed this lot to Shriver, the defendant in this suit, by the same description—that is, of a lot on the northwesterly side of Ocean avenue.

Both parties claim title by accretion. It will be assumed that the alluvial deposits that changed the line of high water were such as, by the common law, would extend the title of a riparian owner to the line of high water as it was at the commencement of this suit. The material proposition for

consideration is, which of these parties is by law entitled to the increment by alluvion. The call in the deed for Ocean avenue as a boundary carried the grantee's title to the middle line of the avenue. *Salter* v. *Jonas,* 10 *Vroom* 469. The avenue as delineated on the map is a fixed monument in the description in the deed, and in that respect it differs from a boundary on the ocean, where, by force of the description itself, the title of the grantee will advance or recede as the line of high water changes from time to time, and he will hold by the same boundary, including the accumulated soil that has arisen from alluvial formations. *Scratton* v. *Brown,* 4 *Barn. & C.* 485 ; *Rex* v. *Yarborough,* 3 *Id.* 91 ; *S. C., H. L., sub nom. Gifford* v. *Yarborough,* 5 *Bing.* 163 ; *Camden and Atlantic Land Co.* v. *Lippincott,* 16 *Vroom* 405.

There is evidence that when the map of 1880 was made Ocean avenue was actually laid out on the ground above high water, but on that map Ocean avenue did not extend below Eighth street. The testimony is conflicting with respect to the line of ordinary high tide in 1883 and 1884. There is evidence that the ocean after 1880 gradually worked inland, carrying away the avenue, or part of it, in front of lot No. 849, and that in 1895 the ordinary high water came up to this lot. In 1897 the ocean began to recede, and the map of the riparian commissioners indicates a high-water line in Ocean avenue. On the 3d of August, 1897, Shriver obtained a grant from the riparian commissioners covering in terms a strip of land fifty feet in width between the extended lines of the lateral boundaries of lot No. 849, from the high-water line as indicated by the commissioners to the commissioners' exterior line, a distance of nine hundred and eighty-five feet. This suit was commenced in 1898. The controversy concerns the title to the strip of land within the description of the riparian grant, fifty feet wide, extending from the westerly side of Ocean avenue, easterly about one hundred and fifty feet. I have assumed the advance of high water to or upon the lot 849 at the times above mentioned, but there is little evidence with respect to the line of

ordinary high tide before 1897.  The distinction between the waters by the action of the sea overflowing lands and the line of ordinary high tide, is of importance in deciding the problem involved in this case.

Although the call in the deed from the association to Howell is for Ocean avenue as a fixed monument, I do not consider that fact decisive in this case.  The doctrine of dereliction and accretion depends upon principles that are peculiar to that subject.  The right to alluvion depends upon the fact of the contiguity of the estate to the water, and to give a right to accession and accretion there must be an estate to which the accession can attach.  *Saulet* v. *Shepherd,* 4 *Wall.* 502.  The doctrine whereby title is acquired by accretion is founded on the principle of compensation.  The proprietor of lands having a boundary on the sea is obliged to accept the alteration of his boundary by the changes to which the shore is subject.  He is subject to loss by the same means that may add to his territory ; and, as he is without remedy for his loss, so he is entitled to the gain which may arise from alluvial formations.  This rule is vindicated on the principle of natural justice, that he who sustains the burden of losses imposed by the contiguity of waters ought to receive whatever benefits they may bring by accretion.  *Banks* v. *Ogden,* 2 *Id.* 57 ; 1 *Am. & Eng. Encycl. L.* (2d ed.) 476, *note* 1.

Lands gained from the sea are *per alluvionem,* or land washed up by the sea, and *per relictionem,* derelict land or land left dry by the retirement of the sea.  *Hall R. Cr.* 108. The doctrine of accretion applies in both these instances ; for, as was said by Lord Hale, "there is no alluvion without some kind of reliction, for the sea shuts out itself."  *Id.* 115.

There is another condition under which the doctrine of accretion is presented—that is, of ground once *terra firma,* but since flooded, which has been recovered.  Mr. Callis puts this case : "The sea overflows a field where divers men's grounds lie promiscuously, and there continueth so long that the same is accounted parcel of the sea ; and then after many years the sea goes back and leaves the same, but the grounds

are so defaced as the bounds thereof be clean extinct and grown out of knowledge, it may be that the king shall have those grounds; yet in histories I find that *Nilus* every year so overflows the grounds adjoining that their bounds are defaced thereby, yet they are able to set them out by the art of geometry." *Callis* 51. To which Mr. Hall says: "At this day it may be concluded that the former ownership may be identified by mensuration, so that if the sea suddenly swallow up ten acres, and after several years leave twenty acres dry, the ten acres may be reclaimed by admeasurement, but then the locality must be proved." *Hall.* 130.

The common law is stated in Hale's *De Jure Maris*, in these words: " If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it, or though the marks be defaced, yet if *by situation and extent of quantity and bounding upon the firm land, the same can be known, though the sea leave this land again or it be by art or industry regained, the subject doth not lose his propriety.* * * * But suppose the inundation of the sea deface the marks and boundaries, yet if the certain extent or contents from the land not overflown can be evidenced, though the bounds be defaced, yet it *shall be returned to the owner according to those quantities and extents that it formerly had.* Only if any man be at the charge of inning of it, it seems by a decree of sewers he may hold it till he be reimbursed his charges, as was done in the case of Burnell before alleged. *But if it be freely left again by the reflux and recess of the sea, the owner may have his land as before, if he can make it out where and what it was; for he cannot lose his propriety of the soil, though it be for a time become part of the sea."* *Harg. Law Tr.* 15, 16, 17. Lord Justice Lindley, speaking on this subject in 1878, said: " Our own law may be traced back through Blackstone, Hale, Britton, Fleta and Bracton, to the Institutes of Justinian, from which Bracton evidently took his exposition of the subject." *Foster* v. *Wright*, 4 *C. P. D.* 438, 446. " The principle laid down by Lord Hale, that the party who suffers

the loss shall also be entitled to the benefit, governs and decides the question." Baron Alderson, *In re Hull and Shelby Railway Co.*, 5 *Mees. & W.* 327.

New Orleans *v.* United States is the leading case in this country. The court there said : " The question is well settled at common law that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory, and as he is without remedy for his loss in this way he cannot be held accountable for his gain." 10 *Pet.* 662; *Jones* v. *Soulard*, 24 *How.* 41 ; *Banks* v. *Ogden*, 2 *Wall.* 57 ; *Saulet* v. *Shepherd*, 4 *Id.* 502 ; *St. Clair County* v. *Lovingston*, 23 *Id.* 46 ; *Jefferis* v. *East Omaha Land Co.*, 134 *U. S.* 178.

To entitle a proprietor to the right of accretion he must be a riparian owner and his land must adjoin the line of ordinary high tide. In *Fitzgerald* v. *Faunce*, 17 *Vroom* 536, this court held that a strip of land four feet in width interposed between the lands of an adjacent proprietor and the water deprived the latter of the rights of a riparian owner, although that strip was conveyed for use and enjoyment for purposes of fishing. So, also, if a strip of land, however small, intervene between the premises conveyed and the water at ordinary high water the owner will not be entitled to the accretion (*Saulet* v. *Shepherd*, 4 *Wall.* 502 ; *Trustees, &c., of the Town of East Hampton* v. *Kirk*, 84 *N. Y.* 215), and, as between vendor and vendee, the right to alluvion depends upon the condition of the land at the time of the transfer of the legal title. *Gould Wat.*, § 156.

In Jones *v.* Johnson the facts were these : One Robert A. Kinzie was the owner of a tract of land situate in the bend of the Chicago river. In February, 1833, he laid out an addition to the town of Chicago upon this fractional section and made a plat of the same, which was recorded in the re-

corder's office of the county on the 18th of January, 1834. On this plat lots Nos. 34 and 35 were delineated as water lots. Johnson, the plaintiff in the ejectment, was the owner of No. 34; Jones, the defendant, of No. 35. The controversy between them was with respect to the title to alluvion that had been made by the cutting of a new channel in the river. On September 1st, 1834, Kinzie conveyed to Jones, describing the lot as being water lot No. 35, &c., "agreeably to the town plat recorded, &c., to which reference may be had if necessary." On the 22d of October, 1835, Kinzie conveyed to Johnson, the plaintiff, lot No. 34, describing it as a water lot and by the same reference to the town plat. In 1833 the government commenced the construction of the harbor of the city by the erection of two piers, the effect of which was to turn the river from its sweep southerly across the sand bars to the waters of the lake between the two piers. After the construction of the harbor and extension of the piers the shore was greatly changed, the firm land having increased by the washing of sand and earth and the recession of the waters to the extent of some twelve hundred feet in width. The parties respectively claimed title to their share of the increment. In determining this question the court held that the true rule was to ascertain whether the lot claimed by the plaintiff had any water front at the time the deed under which he claimed was executed, and not at the time when the lot was originally laid out. There was an instruction by the court on the assumption that lot No. 34 should be located on the ground as of the time of the survey and plat of February, 1833, some two years and nine months previous to the conveyance to the plaintiff, and not the date of the conveyance; and if at that time the dividing line between 34 and 35 would strike the lake north of where the north pier in the harbor was subsequently built, the plaintiff would be enabled to take under his deed, not only lot No. 34 as laid down on the plat, but all subsequent accretions by alluvion or dereliction whatever might be the extent of the new formed land. This instruction was held erroneous, the court saying: "The true answer to the

position assumed, and which governed the trial below, is that the water boundary on the lake is to be deemed the true southern boundary of the lot at the date of the conveyance; that alluvial accretions since the date of the deed belong to the plaintiff as owner of adjoining land, and that past accretions belong to the then owner." 18 *How.* 150. The same case was again before the court, and it was held that the right which the owner of a water lot has to the accretion in front of it depends upon its condition at the date of the deed which conveyed to him a legal title, and cannot be carried back to the date of a title bond previously assigned to him under which he procured the deed. 1 *Black* 209, 221.

In *Banks* v. *Ogden*, 2 *Wall.* 57, the defendant became the owner of a block or lot bounded by a street on the McKenzie plat. McKenzie's title subsequently devolved on Banks. Ogden's deed was dated in 1833. In 1844 and 1845 land was formed which extended easterly more than two hundred feet from the shore of the lake at the time Ogden's deed was made. At that time the waters of the lake limited Sands street by an oblique line, creating a triangle in front of Ogden's lot within the designated lines of the street. This triangle was less than thirty-three feet wide at its southern end and it diminished to a point concurrent with the northerly line of Ogden's lot. The Supreme Court of the United States held that the fact that the land within that triangle belonged to the original proprietor, gave to Banks the new land that was formed in 1844 and 1845 by accretion. The map of the premises in question in that case, printed on page 59 of the report, exhibits a similarity between the premises then in question and the premises involved in this case. It will also be observed that in that case it was held, as our courts hold, that a boundary on a street carries title to the grantee to the middle line of the street.

In *Mulry* v. *Norton*, 100 *N. Y.* 424, it was held that where the title of a littoral proprietor to land by accretion was involved, that while the title of such a proprietor is liable to be lost by erosion or submergence, erosion to effect that result

must be accomplished by a transportation of the land beyond the owner's boundary; and it may be returned by accretion, in which case the ownership temporarily lost may be regained; and so land lost by submergence may be regained by reliction, unless the submergence has been followed by such a lapse of time as to preclude the identity of the land from being established. If after a submergence the water disappears from the land, either by its gradual retirement or the elevation of the land by natural or artificial means, the proprietorship returns to the original owner.

The cases and text-books have so uniformly adopted the principle that the line of ordinary high tide at the time of the conveyance "governs and decides the question as between vendor and vendee" that further citation is unnecessary. On no other rule can the principle be applied that as the proprietor of lands is subject to loss by the encroachment of the sea, he is therefore entitled to the gain which may arise from alluvial formations.

The rules of construction and appropriation of lands acquired by accretion, adopted in the above cases, are applicable to the present suit. As between the association and Howell, the situation of the lot conveyed to him with respect to the line of ordinary high water is decisive of the rights of the parties respectively. Shriver acquired title under Howell by the same description as was contained in the deed to Howell. As against the association he could not acquire any title or estate or right beyond that which the association, by its deed, in 1884, conveyed to Howell.

To maintain the title of the defendant, counsel contends that Shriver's right to alluvial deposits is referable to the condition that existed in 1895, when he acquired title under Howell, and not to the time when the association conveyed to Howell. This contention rests upon the assumption that although, as between the association and Howell, the condition of the line of high water was such as that, between those parties, the association may have remained the riparian owner, yet, by the changes that subsequently occurred,

Shriver acquired a new right and became the riparian owner. The principle that underlies this proposition is that, by the submergence of the property of the original riparian owner, the title of the latter was destroyed. This position of the defendant's counsel is at variance with two propositions, well established by the authorities—*first*, that as against any claim that may be made under the Howell title, the right of the association must be determined as of the time when it conveyed to Howell; and *second*, that by the submergence the owner of the land does not entirely lose his property in the soil. The only authority cited for the proposition relied on by the defence is *Welles* v. *Bailey*, 55 *Conn.* 292. In that case the parties were originally owners of adjoining uplands. By changes in the channel of the river the lot of Welles was transferred to the other side of the river from that on which it originally lay. As was said by the learned judge who delivered the opinion of the court in that case, it involved the application, in circumstances somewhat peculiar, of the principle of accretion and reliction growing out of changes in the bed of the river. The decision was controlled by the fact that the river was and continued a natural boundary between the parties, with respect to which the rights of the parties changed with the changes in the bed of the stream. In that respect no criticism is made on the result.

It is well settled at common law that where lands of riparian owners are separated by a river—each being a riparian owner but on different sides of the stream—the river is the common boundary, and if its course be changed by alluvial formations the owners of such lands will hold to the same boundary, including the accumulated soil. In such cases "the *filum aquæ* is the common mark or boundary, though it borrow great quantities of land, sometimes of one side, sometimes of the other, and give them to the opposite shore." *Hale De Jure* 5, 6 ; *New Orleans* v. *United States*, 10 *Pet.* 662 ; *Nebraska* v. *Iowa*, 143 *U. S.* 359, 360, 366. An extract from Vattel (*Du Droit D'Alluvion*, § 268), translated and cited with approval by Mr. Justice Brewer in the case

last referred to (at *p.* 366), states this doctrine fully; and it will be remembered that the common law rule was adopted from the civil law. The language of the author is: "As soon as it is determined that a river constitutes the boundary line between two territories, whether it remains common to the inhabitants on each of its banks or whether each shares half of it, or finally, whether it belongs entirely to one of them, their rights with respect to the river are in nowise changed by the alluvion. If, therefore, it happens that, by a natural effect of the current, one of the two territories receives an increase, while the river gradually encroaches on the opposite bank, the river still remains the natural boundary of the two territories, and, notwithstanding the progressive changes in its course, each retains over it the same rights which it possessed before; so that if, for instance, it be divided in the middle between the owners of the opposite banks, that middle, though it changes its place, will continue to be the line of separation between the two neighbors. The one loses, it is true, while the other gains; but nature alone produces this change; she destroys the land of the one while she forms new land for the other. The case cannot be otherwise determined, since they have taken the river alone for their limits."

The passages in the opinion in Welles *v.* Bailey, that are pressed upon the attention of this court, are these: "If a particular tract was entirely cut off from the river by an intervening tract, and that intervening tract should be gradually washed away, until the remoter tract was reached by the river, the latter tract would become riparian as much as if it had been originally such. * * * If after washing away the intervening tract it should encroach upon the remoter lot, and should then begin to change its movement in the other direction, gradually restoring what it had taken from the intervening lot, the whole, by the law of accretion, would belong to the remoter but now approximate lot." These sentences detached from the body of the opinion and put aside from the case *sub judice,* if they were intended to express the

rule of law governing rights by accretion, are contrary to the general doctrine of the law as declared from the earliest period. In the passage quoted from Lord Hale, it is declared with emphasis that if the land of the subject adjoining the sea be swallowed up by the sea, and it be freely left again by the reflux and recess of the sea, the owner may have his land as before if he can make out where and what it was, for he cannot lose his property in the soil, though it be for a time part of the sea. The passage from Lord Hale, from which this extract is made, has been uniformly adopted, I think, without dissent. It must also be borne in mind that the law of alluvion and accretion is founded on the principle of natural justice, that he who sustains the burden of losses imposed by the contiguity of waters ought to receive whatever benefits they may bring by accretion. It would be difficult to find any ground consistent with justice that would deprive the association of its rights as riparian owner such as existed when title passed from it to Howell, and transfer to the defendant the property in question as accretions to his lot with its boundary on the northwesterly line of Ocean avenue. If the encroachment of the ocean subsequently passed the line of the Howell lot as it was in 1884, and carried part of it away, the owner of that lot can have no equity beyond the restoration to his lot of what he has lost, " according to those quantities and extents that it formerly had."

Gilbert *v.* Eldridge, decided by the Supreme Court of Minnesota in 1891, is a case in principle similar to the one now before the court. In that case one Orrin Rice, the owner of a tract of shore land, in 1858 platted it out, designating streets and blocks. At the time of the platting the line of low water crossed block 110. The plaintiff owned block 108 and the defendants block 110 on this plat. Block 108 was southwest of block 110, separated from it by a street, and was wholly above and beyond the shore line. The platting by the owner extended into the shallow water of the bay of Duluth, beyond the shore line; other lots, blocks and streets being platted in the water beyond block 110. On December

31st, 1858, Rice by warrantee deed conveyed block 110 to one Wilson, to whose rights the defendants succeeded, and block 108 to one Meeker, to whose rights the plaintiff succeeded. In 1873 the city, under legislative authority, established a dock line in the waters of the bay several hundred feet distant from block 110 and nearly parallel with its water front, and in 1872 caused a ship canal to be dug through another point of land, which resulted in so changing the currents in the waters of the bay that the water gradually encroached upon and washed away the shore. In 1885 this encroachment of the water had extended so far inland that the shore line at low water ran across block 108, block 110 and the intervening street having become submerged. A process of filling in the submerged land was projected by the defendants so as to again raise the surface of block 110 above the surface of the water. The plaintiff filed a bill to prevent by injunction such attempted and proposed reclamation. He rested his claim to relief on the ground that by the gradual and imperceptible encroachment of the water and the retrogression of the shore line, his land, block 108, had become riparian estate, and that whatever riparian rights were originally incident to the shore land were now vested in him as the riparian owner; and that the title of the defendants to block 110, and the riparian rights which may have been incident thereto, had been extinguished. The judgment of the court below was in favor of the defendants, and that judgment was affirmed in the Supreme Court, with an elaborate opinion, holding that the gradual retirement of the shore line until the plaintiff's block had come to be the water front had been of no effect to vest in him any property rights in respect to such submerged blocks. 49 *N. W. Rep.* 679.

The case just cited presents the question passed upon in the Connecticut case in conformity with the law of accretion, without complications arising from changes in a natural boundary, and is in that respect in harmony with the doctrine of the common law and the decisions of the courts of England and of this country.

The defendant also claimed title under his riparian grant,

This grant purported to be made by the riparian commission-ers pursuant to the act of 1871. *Gen. Stat., p.* 2790. The Riparian act of 1869 (*Pamph. L., p.* 1017), which was passed upon in *Hoboken* v. *Pennsylvania Railroad Co.,* 124 *U. S.* 656, is expressly limited in its operation to the tide waters of the Hudson river, New York bay and the Kill von Kull, lying between Enyard's dock, on the Kill von Kull, and the New York State line, and has no application to the *locus in quo. Fitzgerald* v. *Faunce,* 17 *Vroom* 536, 594. The act of 1871 empowers the riparian commissioners to make grants of the lands under water to the riparian owners only, and a grant by the commissioners under that act to anyone else would be *ultra vires. Fitzgerald* v. *Faunce, supra; Polhemus* v. *Bateman,* 31 *Vroom* 163. The subsequent act of March 27th, 1874, seems to empower the riparian commissioners to make grants of such lands to any applicant. *Gen. Stat., p.* 2791. The riparian commissioners have no power to examine into and decide upon the applicant's title to the land. *Brown* v. *Morris Canal Co.,* 3 *Dutcher* 648, 653.

The riparian grant in this case was made by the commis-sioners under the act of 1871. It recites that " Whereas, pursuant to an act of the legislature, approved March 21st, 1871, entitled 'A further supplement to an act entitled "An act to ascertain the rights of the state and of riparian owners in the lands lying under the waters of the Bay of New York and elsewhere in this state," approved April eleventh, one thousand eight hundred and sixty-four,' and other acts and joint resolutions of the legislature of said state, William Shriver, &c., being the owner of lands fronting on the Atlantic ocean, in Ocean City, in the county of Cape May, and State of New Jersey, which lie above high-water mark and in front of which the lands under water hereinafter described are situated, has applied to the riparian commissioners of said state for a grant of the said lands under water," &c.; and, after describing the lands granted, with words of conveyance, contained an express proviso hereinafter referred to. The purport of this grant unmistakably indicates the purpose of the riparian commissioners to vest the state's rights in these

lands in Shriver conditionally on his ownership of the lands to which the grant attached. It expressly provides that in case the grantee is not the owner of the land adjoining the land under water therein granted, " this instrument and conveyance, so far as it binds the state, &c., shall be void as affecting any part or parts of said land which joins land not owned by the said William Shriver." If the state is not bound by this grant in the event of the ownership of the ripa being in another, the lands under water comprised in this grant are still the property of the state, and Shriver acquired no title under the grant. *Polhemus* v. *Bateman,* 31 *Vroom* 163, 165.

The case between these parties turns wholly on the condition of the line of ordinary high tide in 1884, the date of the deed to Howell. If, at that time, the association was the owner, in whole or in part, of the land on the line of ordinary high water in front of this lot, its title was carried out to the full extent of the land obtained by the accretion, and Shriver did not become the owner of the land referred to in the riparian grant. If, on the other hand, the line of ordinary high tide in 1884, when the association conveyed its title, was on this lot, then, by force of the conveyance to Howell, he became the riparian owner, and he and his grantee are entitled to the accretions. In that event the plaintiff has no title to the *locus in quo.*

The learned judge charged the jury that if the high-water line, before or in 1895, advanced to or on the lot 849, that lot became a riparian lot, and whatever alluvial increase the ocean had in its advance brought to and in front of the lot became the land of the defendant. This instruction was erroneous, and for this reason the judgment should be reversed.

*For affirmance*—MAGIE (CHANCELLOR), DIXON, COLLINS. 3.

*For reversal*—DEPUE (CHIEF JUSTICE), VAN SYCKEL, GARRISON, GUMMERE, HENDRICKSON, ADAMS, VREDENBURGH, VOORHEES. 8.