SAMUEL H. GREY, attorney-general, ex rel., informant,

*v.*

MORRIS & CUMMINGS DREDGING COMPANY.

[Filed May 16th, 1903.]

1. Equity has jurisdiction of an information by the state to annul a lease of its lands under water on the ground that the lessee was not the owner of the shore front, but, with knowledge of the facts, had suppressed them, and that the lease was conditioned to be void if he was not such owner.

2. Where one, at the time of receiving a lease from the state of its land under water, was the owner of the shore, and so entitled to the lease, the state cannot avoid it because another afterwards acquired title by adverse possession to the shore.

3. Where one selling land reserves a strip along the shore, above which ordinary high water does not come, his right, as against his vendee, to a lease from the state of the land under water is not lost by the ordinary high-water line rising above such strip.

4. Evidence in an action by the state to annul a lease of lands under water on the ground that defendant was not the owner of the shore front—*Held*, to show that he was such owner.

5. Where the state makes a lease of lands under water, conditioned to be void if the lessee is not the owner of the shore front, it may be avoided, he not being such owner, though, by his deed of the shore front, he had reserved the water rights, even if he is entitled to obtain a lease of such lands as against his vendee.

On information, answer, replication and proofs.

*Mr. James E. Howell,* for the attorney-general.

*Mr. Lindley M. Garrison,* for the defendant.

EMERY, V. C.

The attorney-general, on behalf of the state, files this information for the purpose of annulling a lease of the state's lands under water in New York bay, made to the defendant by the

riparian commissioners under the Riparian acts. The application for the grant or lease made by the defendant, dated April 11th, 1881, covered a shore front of about two thousand five hundred feet, the whole of which was alleged to belong to the defendant in fee and to be in its possession. Upon this application a grant was made by the riparian commissioners on April 30th, 1881, for the lands under water in front of the whole lands, of which defendant claimed to be shore owner. The lease was perpetual, for the annual rental of $4,233.60 for the entire lands, with a purchase-price of $64,080, as compensation for conveyance, free from rent. The lease recites defendant's ownership of the shore in front of which the leased lands lay and the application for a lease to it as shore owner under the Riparian acts. It contained covenants on the part of the state not to give any grant or license to any other person or corporation affecting the lands leased. This proviso, however, followed the covenants and concluded the terms of the lease:

"*Provided* also nevertheless, that if the said party of the second part is not the owner of the lands adjoining the lands under water hereby conveyed, then and in that case this conveyance and lease, so far as the same binds the state and all covenants herein on the part of the state, shall be void."

The information alleges that as to a shore front of about two hundred and forty feet of shore, in front of which lands under water were included in this grant, the defendant was not the shore owner, but that one Joseph W. Hancox, under whom relator claims, was the shore owner, and that the grant or lease was made to defendant, without notice to Hancox, as required by the Riparian acts. Hancox conveyed the tract claimed to be on the shore front to the relator on September 1st, 1882, and this information, on its relation, was filed on October 11th, 1899. The information alleges that Hancox was the owner of this portion of the shore, in front of which the lands were leased; that the defendant had no right or title or interest therein; that its representation in the application that it was the owner of all the shore lands was not true, and that the defendant, with full knowledge of the facts as to ownership, suppressed them. The

grant is alleged to be void and a cloud upon the title to the lands under water included therein; and the information prays a decree that the lease may be declared null and void and the cloud on the state's title to the lands therein described may be removed. The information appears to claim the avoidance of the entire grant, and not merely of the portion in front of the lands claimed to belong to relator. No allegation is made in the information as to the payments of rents under the lease, neither is there any tender or offer to return any portion of the rents received. The answer denies Hancox's ownership of the shore front, as claimed by the relator, and asserts its own title as shore owner, at the time of the lease, to the entire shore in front of which the lands under water were leased. It sets up, also, the payment by defendant to the state of over $78,000 as rentals for the property, and the expenditure by defendant of large sums of money in filling in the lands under water. The knowledge of Hancox and of the relator, for many years, that the riparian lease in front of the lands claimed by relator had been made to defendant, and that defendant was paying the rentals and the expense of filling in the lands, is further set up as an estoppel or bar against questioning the lease. As to the right of Hancox or relator, as shore owners, the defendant further sets up that in the deed to Clement D. Hancox, the predecessor of Joseph Hancox in title, conveying to him on July 1st, 1863, the tract of land which relator claims to bound on the shore, it was agreed between the grantee, Clement D. Hancox, and his grantor, George W. Howe, who then owned all the shore front subsequently acquired by the defendant, that the grantor reserved to himself and his legal representatives the water rights in front of said lands in New York bay, and the right to dock out and reclaim the same, as far as they might desire, to their own use, benefit and behoof forever. These water rights, it is alleged, have been expressly reserved in all of the subsequent deeds and mortgages of the lands conveyed to Clement D. Hancox, and were reserved in the conveyance to relator. Defendant claims to have succeeded to all of Howe's rights, and that at the time of Howe's conveyance to Hancox, on July 1st, 1863, the line of the shore did not reach the tract conveyed.

Three questions were argued at the hearing, and are to be considered—*first,* whether this court has jurisdiction to annul the grant in a proceeding of this character; *second,* whether the relator's predecessors in title were the owners of the shore front, as claimed, either in 1863, at the time of the original severance of the title to the riparian lands, by the deed from Howe to Clement D. Hancox, or at the time of the riparian grant in 1881, and *third,* the effect of the reservation of water rights to the grantor Howe upon the lease in question. Upon these points I reach the following conclusions:

*First.* The question of jurisdiction in equity to annul grants of this character, alleged by the state to have been obtained by a person not shore owner and by a willful suppression of facts or false representation, is discussed and decided by Chancellor Magie in *Attorney-General, ex rel. City of Elizabeth,* v. *Central Railroad of New Jersey, 16 Dick. Ch. Rep. 259 (1901).* The jurisdiction is maintained, and the only further observation to be made is that, in the present case, there is the additional circumstance that, by the proviso, the lease is expressly declared to be void, as against the state, if the lessee is not the owner of the lands adjoining the lands under water. This proviso concludes defendant as to the materiality of the representation of ownership, and as to the right of the state to avoid the lease by reason of its falsity. If the method or proceeding selected by the state to carry into effect its right of avoiding the lease is a bill in equity to annul the lease, the state may, under this method, be subject to the application of equitable rules applicable to private suitors, as to the terms upon which relief may be granted, including repayment of rentals or other disbursements, but these equities, if they exist, are matters for adjustment by final decree, and do not touch the question of jurisdiction. *Attorney-General* v. *Central Railroad Co., supra.* A bill or information in equity by the state to annul a grant or patent is a proceeding more favorable to the grantee than an annulment of the grant by the making by the state of a subsequent grant to another, in the exercise of its claim, and is the usual method followed in such cases in the American courts, where the state itself contests in legal proceed-

ings the right to annul the grant. *United States* v. *Stone, 2 Wall. 525; United States* v. *Budd, 144 U. S. 154; People* v. *Colgate, 67 N. Y. 512; 22 Am. & Eng. Encycl. L. (1st. ed.) 67.* In the present case the riparian commissioners, on the application made to them by the relator, in March, 1899, for a riparian grant as shore owner of the lands in question, declined to make the grant because of the previous grant to the defendant as shore owner, and declined to decide this disputed question of fact. The evidence submitted at this hearing in relation to the shore line and the ownership of the shore clearly illustrates the propriety of this action of the commissioners in refusing to decide this question.

I conclude, therefore, that, upon the facts alleged in this information, that the court has jurisdiction to decide whether the defendant, at the time of the lease of the lands under water, was the riparian owner to whom the commissioners were authorized, under the statute, to make the lease, and whether the representation of ownership (as to the portion of the lands claimed by the relator) was false in fact. If the relator or its predecessor in title was the riparian owner, then, under the Riparian act of March 31st, 1869, section 8, it was, as such owner, entitled to six months' notice of the application, and no notice having been given, the grant would have been *ultra vires* and void. *Attorney-General* v. *Central Railroad Co., supra.* This provision as to six months' notice to the shore owners, under the eighth section of the Riparian act, is still in force, and the act of March 27th, 1874 (*Gen. Stat. p. 2791*), operates only to change the eighth section, by changing the number of the officers authorized to make the grant and the powers of the commissioners as to fixing compensation. The supplement of March 27th, 1874, has full operation by this construction, and is not to be construed as repealing the provisions of the eighth section requiring notice to the 'shore owners before grant to any other applicant. It is admitted that no notice of the defendant's application for a lease was given to relator's predecessor in title, and the next question, therefore, is whether the relator was the shore owner of portion of the lands as alleged in the information.

*Second.* The dispute as to the shore front covered by defendant's lease extends only to the portion thereof claimed to be the easterly boundary of a lot or tract owned by the relator. This tract was conveyed to Clement D. Hancox, relator's predecessor in title, by George W. Howe, by deed dated July 1st, 1863. The tract lies on the southerly side of a public street, called Chapel avenue, running from the Morris canal easterly to New York bay, and at the end of the street there was then a wharf or dock extending into the bay. At the time of the conveyance Howe was, and since November, 1854, had been, the owner of the lands between the Morris canal and the New York bay, on both the north and south sides of Chapel avenue.

Howe's deed to Clement D. Hancox of July 1st, 1863, conveyed a rectangular lot on the south side of Chapel avenue, one hundred and sixty-nine feet front by two hundred and seventeen and one-half feet deep. The easterly boundary was, according to the description in the deed, one hundred and sixty-nine feet from and parallel with the western boundary with which the description commenced, and the first question on this branch of the case is whether, when properly located according to the description in the deed, the easterly boundary of the lot ran to the edge of a bulkhead then erected on the property, or whether the easterly line was located within the bulkhead and six feet therefrom. The bulkhead itself, although then in existence and a well-defined monument, was not referred to in the description. There was also in existence at the time of the conveyance a small building on the south side of Chapel avenue, on or near the line of the avenue, and this building is the only monument on the ground expressly referred to in the deed as fixing the location of the westerly line of the lot. The full description was as follows:

"All that certain lot, piece, tract or parcel of land and premises situate, lying and being in the township of Greenville, in the county of Hudson and State of New Jersey, butted and bounded as follows: Commencing on the southwesterly side of Chapel avenue at a point where the easterly corner of a small building which adjoins said avenue and lies southeasterly of the Morris canal and running from thence southwesterly along the southeasterly side of said building a course south fifty-two degrees and

eleven minutes west 217 feet 5 inches to the westerly corner of a building standing on the land hereby conveyed; thence south thirty-eight degrees and twenty-seven minutes east one hundred and sixty-nine feet; thence north fifty-two degrees and eleven minutes east two hundred and seventeen feet five inches to the southwest side of Chapel avenue; thence north along the said avenue thirty-eight degrees and twenty-seven minutes west one hundred and sixty-nine feet to the place of beginning. Being part of the premises which the said parties of the first part purchased from Peter H. Dwyer and easterly of the Morris canal."

This small building fixed for the beginning corner was removed subsequent to the purchase, and shortly after the subsequent purchase by Clement D. Hancox from Howe on December 1st, 1863, of the lot of land lying on the west, upon which the building stood. The building referred to as at the end of the first course in the deed has also disappeared, but this building is not referred to as on the line of the lot, or fixing its western boundary at any other point than the end of the first line. Evidence as to the precise location of the small building on Chapel avenue is offered by the production of the transit notes of a surveyor, now deceased, Garret I. Van Horne. These notes appear to have been made by him for Captain Howe, the grantor, on June 25th, 1863, a few days before the conveyance. This survey shows a small building very near Chapel avenue, a larger building at or near the southerly and westerly corner of the lot, and the Palisades along the easterly boundary, both the top and the bottom lines of the Palisades being shown. This survey appears on its face to be a survey of the entire tract lying south of Chapel avenue, between the Morris canal and New York bay, of which Captain Howe was then the owner, the line of the bay being shown by a sinuous shore line lying outside of the Palisades, and at no point nearer than thirty feet. Whether this line is at high or low water is not shown. The entire tract extends on Chapel avenue two hundred and ninety-seven and two-tenths feet from the line of the Palisades, and this tract is divided into two lots, the eastern lot, toward the bay, being one hundred and seventy-five feet, and the western lot being one hundred and twenty-two and two-tenths feet. On the line dividing the lots are two buildings, the small building on Chapel avenue, located on the western lot, and the southerly or south-

easterly side of which is apparently the dividing line of the two lots, and another larger building located on the eastern lot, whose westerly side is also apparently on the dividing line. The description lays the western line of the easterly lot along the southeasterly side of the small building, but not along the westerly side of the large building, which is referred to only to fix the end of the lot. The first course in the deed is south, fifty-two degrees eleven minutes west; in the survey it is "S 51° 06" W abt.," a variation of about one degree. The location of the eastern corner of the small building is fixed by measurement to an "offset stake," described in the survey as being "13.1 from E cor. of house," and apparently on a line with the southeasterly side of the house. By the survey, the northerly side of the small building is very near, but does not actually touch, the line of the highway. If the beginning point of the description be fixed as the intersection of the line of the southeasterly side of this building and the side of Chapel avenue, the entire frontage of the eastern lot shown in the survey up to the line of the Palisades is one hundred and seventy-five feet, and a lot fronting one hundred and sixty-nine feet would fall within this line, and approximately the easterly boundary of this lot would be a dotted line shown on the survey six feet to the west of the Palisades. If this be the true line intended by the deed, Howe, the grantor, retained title for six feet west of the Palisades and remained shore owner without any question. Another survey and map of the property have been offered in evidence by the defendant, made by Soper & Brittin on May 5th, 1865, for Clement D. Hancox, after his purchase of both the eastern and western lots shown on Van Horne's survey. These surveyors, Soper & Brittin, are also deceased, but their transit notes and map have been offered in evidence. The small building on Chapel avenue, shown on the Van Horne map of 1863, does not appear on the Soper & Brittin survey or map of 1865. As appears by the evidence, the building had been used as servants' quarters in connection with a hotel once on the lot sold to Hancox in July, 1863. The hotel had been burned down prior to Hancox's purchase and he erected a residence on its site, using part or all of its foundation. The

Soper and Brittin survey and map indicate, however, two stakes on or near the south side of Chapel avenue, each marked on their map "old stake G. I. V. H." One of these stakes is at the line of the Palisades, and the other one hundred and seventy-five feet westerly therefrom, and approximately near where, by the evidence of witnesses, the small building stood. The latter stake is claimed to be the "offset stake" of the Van Horne survey, and its location is, on the Soper & Brittin survey, fixed by measurements or distances from the walls of the residence erected by Hancox. This residence and the walls are still standing on the same location, and, although the "offset stake" has disappeared, its location can now be accurately fixed on the ground by the measurements on the Soper & Brittin survey. And if the stake designated in their survey as the "old G. I. V. H. stake" is the offset stake of Van Horne's survey, the easterly side of the building and the westerly line of the lot can now be accurately located. The Soper & Brittin survey also shows that the distance between the old stakes, called the G. I. V. H. stakes, was about one hundred and seventy-five feet, and that if the lot was only one hundred and sixty-nine feet wide, the easterly boundary fell within the Palisades and left the ownership of the shore in Howe. Upon the question of the location of the lot by its description in the deed, I consider the Van Horne and Soper & Brittin surveys to be the most satisfactory, if not the controlling evidence upon the point, that the easterly line of the lot conveyed did not in fact reach to the Palisades. The criticisms of counsel upon the Van Horne survey relate to points which do not, in my judgment, affect their reliability upon the main question now involved, viz., the location of the southeasterly line of the small building which was the westerly line of the lot, and the frontage of the lot on Chapel avenue. This line and this frontage, one hundred and sixty-nine feet, seem to me to be satisfactorily made out by the Van Horne map, confirmed as it is by the Soper & Brittin map and survey, and to show that the title of Clement D. Hancox, under whom the relator claims, did not reach to the Palisades. If the survey of Van Horne and Soper & Brittin be rejected, the evidence shows no means

of fixing accurately the westerly line of the lot, by reference to the side of the small building on Chapel avenue, and both parties have attempted the location of the easterly line of the lot by reference to the Dwyer deed, referred to in Howe's deed to Hancox. At the end of the description it is stated that the lot conveyed to Hancox is part of the property conveyed to Howe by Dwyer. Dwyer's title was derived from one Benjamin H. Broomhead, who, in 1849, was the owner of all the lands east of the canal and on both sides of Chapel avenue. At this time a map of the premises, called Bacot's map, existed, and the sales to Dwyer were made by reference to this map, which cannot now be found. On this map a block was laid out, bounded on the west by Canal avenue, north by Chapel avenue, south by Marion avenue, and east by an avenue called Ocean avenue. Dwyer purchased fourteen of these lots, numbers 16 to 22 and 30 to 36, seven fronting on Chapel avenue one hundred and seventy-five feet, and seven immediately in the rear and fronting on Marion avenue, altogether, according to the map and description, a tract one hundred and seventy-five feet on Chapel and Marion avenues, and two hundred and sixteen feet deep. Dwyer finally received title to all of these lots by a single deed from B. H. Broomhead, dated November 1st, 1852, but he had previously received title to twelve of the lots from Broomhead by deeds dated respectively November 12th, 1849, for lots 16 to 21, fronting on Chapel avenue one hundred and fifty feet; April 24th, 1850, for lots 31 to 36, in the rear, fronting on Marion avenue, and July 9th, 1850, for the sixteen-foot strip between the twelve lots. After these three deeds to Dwyer, Benjamin H. Broomhead, by deed dated September 25th, 1850, conveyed to John Broomhead the lots immediately west of Dwyer's purchase, numbers 22 and 30, fronting twenty-five feet on Chapel avenue and running through two hundred and sixteen feet to Marion avenue, and by this deed he also conveyed to John Broomhead

"all the upland and land under water between Chapel and Marion avenues, on the Bacot map, to the eastward of lots Nos. 16 to 36, conveyed to Dwyer, together with the water rights and privileges in New York bay."

Benjamin Broomhead, on March 1st, 1851, conveyed to Corwin & Arbuckle, by reference to another map, called a map of Clark & Bacot, filed by him on that day, eight lots fronting on Canal avenue and being one hundred and ten feet on Chapel avenue and eighty feet three inches on Marion avenue, according to this map. This map shows Canal avenue as a street forty feet wide, lying directly east of the Morris canal. On March 4th, 1851, John Broomhead reconveyed to Benjamin the lands purchased by him on September 25th, 1850 (which included lots 22 and 30 on the lost Bacot map), and on March 25th, 1851, Dwyer reconveyed to Benjamin Broomhead all the lots conveyed to him, numbers 16 to 21 and 31 to 36, on the Bacot map, and with the same reference to this map, but with no reference to the Clark & Bacot map filed March 1st, 1851. Benjamin Broomhead was thus reinvested with the title to all of the land south of Chapel avenue, except the land conveyed to Corwin & Arbuckle on March 1st, 1851; and on November 1st, 1852, Broomhead reconveyed to Dwyer, by the same reference and description to the lost Bacot map as was contained in Dwyer's deed to him, the lots he had received from Dwyer (lots 16 to 21 and 31 to 36), and also then conveyed to Dwyer lots 22 and 30 on the Bacot map, extending from Chapel avenue to Marion avenue—twenty-five by two hundred and sixteen feet—"and adjoining the east line of the tract heretofore conveyed by Broomhead to Corwin & Arbuckle," &c. This deed of November 1st, 1852, therefore conveyed to Dwyer one hundred and seventy-five feet on Chapel avenue east from the Corwin & Arbuckle line, which east line, according to their deed and the Clark & Bacot map, was one hundred and ten feet from the corner of Canal avenue and Chapel avenue. On October 26th, 1854, and while Dwyer owned the lots east of them, Corwin & Arbuckle conveyed to George W. Howe the tract conveyed to them by Broomhead, and by the same description and reference to the Clark & Bacot map, and refer also to a map of Irvingville lots filed in the clerk's office. This deed conveyed also the lands north of Chapel avenue which had been conveyed to Corwin & Arbuckle by Broomhead and were also laid out in lots on the "Irvingville map." The Irving-

ville map also showed that the Corwin & Arbuckle tract began at the corner of Canal avenue and Chapel avenue and extended one hundred and ten feet along Chapel avenue. Canal avenue appears on this map to be forty feet wide and to extend to the towpath of the Morris canal. As appears by the evidence, the towpath at this locality was at the foot of a slope. On November 1st, 1854, Dwyer conveyed to George W. Howe all the premises conveyed to him by Broomhead's deed of November 1st, 1852, and by the same reference and description as contained in his deed to the lost Bacot map. On the same day Benjamin H. Broomhead conveyed to Howe all the lands remaining to him between the canal and the bay, and Howe thus became the owner of all the lands east of the canal and including the adjoining Corwin & Arbuckle and Dwyer lands. Referring to the deed from Dwyer to Howe, it will be seen that the description of the lands in this deed are tied to the intersection of Morris canal and Chapel avenue, and taking the three descriptions in this deed together, the westerly line of Dwyer's tract is fixed at a point one hundred and fifty feet from the crossing of the canal and Chapel avenue. This would allow forty feet for the width of Canal avenue, one hundred and ten feet for the width of the tract conveyed to Howe by Corwin & Arbuckle, and Howe's whole frontage on Chapel avenue from the corner of Canal avenue, as designated in the maps referred to, would be, according to the deeds to him, two hundred and eighty-five feet to the easterly line of the Dwyer lots. Canal avenue, although laid out on the maps, up to the time of Howe's purchase, does not appear to have been in fact laid out, neither was Marion street or avenue laid out, and after Howe's purchase, in 1854, no reference to either Canal avenue or Marion avenue is made in any of the conveyances. The evidence shows that after Howe's purchase there was a fence along the western boundary of his lands, or lands claimed by him, and measuring the width of Canal avenue as forty feet from the towpath at the bottom of the slope, the fence would seem to have been located about twelve feet west of the easterly line of Canal avenue, as laid out on the Clark and Bacot and Irvingville maps. George W. Howe, on

December 1st, 1863, conveyed to Clement Hancox the remaining lands owned by him south of Chapel avenue and west of the tract conveyed to Hancox by the first deed of July 1st, 1863, but the description in this deed contains no reference to either Canal avenue or Marion avenue. The description in this deed of December 1st, 1863, is as follows:

"Commencing at a point in the southeasterly side of Chapple street where the northerly corner of the land of the party of the second part [Hancox] strikes said street and intersects with the easterly corner of the lot hereby intended to be conveyed, and running from thence south fifty-two degrees and eleven minutes west 217 feet 6 inches, thence north thirty-eight degrees & twenty-seven minutes west 89 feet 6 inches, thence north forty-three degrees and forty-two minutes east 220 feet to the southeasterly side of said Chapple avenue, thence southwesterly twenty-eight degrees and twenty-seven minutes east 122 feet to the point or place of beginning, containing 23,000 square feet of ground."

By this description one hundred and twenty-two feet on Chapel avenue is conveyed, and if the westerly boundary in this description is the easterly line of Canal avenue, as it appears on the Clark & Bacot and Irvingville maps, and this line is forty feet from the towpath of the canal, then, by the two deeds of July 1st, 1863, and December 1st, 1863, George W. Howe has conveyed to Hancox two hundred and ninety-one feet (one hundred and sixty-nine plus one hundred and twenty-two) on Chapel avenue east of the line of Canal avenue. This is, by measurement, the distance to the present line of the Palisades from a point forty feet from the towpath of the canal measured along Chapel avenue. And taking the two deeds together as conveying that amount of land (two hundred and ninety-one feet) east of the easterly line of Canal avenue, as fixed on the old maps, the easterly line of the lot first conveyed to Dwyer by Howe is located twelve feet east of the line fixed by the Van Horne and Soper & Brittin maps, and at the present line of the Palisades, which is, according to some witnesses, about six feet farther out than when first built. But the assumption that Howe, in his second conveyance to Hancox of one hundred and twenty-two feet on Chapel avenue, intended to make his western boundary of this one hundred and twenty-two feet the easterly line of Canal avenue, as laid out on

the old maps, is, as it seems to me, clearly without evidence to support it. The deed makes no reference to these maps, and the evidence shows that a fence erected on the western boundary of property occupied by Howe was about twelve feet within the lines of Canal avenue as laid down on the old maps. As the avenue was never opened and all reference to it has been expressly excluded by him in his conveyance, this combined frontage of the two lots conveyed to Hancox cannot be considered as affording a sufficient basis to fix the easterly boundary of the first lot conveyed to Dwyer at or beyond the then existing line of the Palisades. And, on the contrary, taking the old maps referred to in the Dwyer title and the distances from the canal and from Canal avenue, as given on these maps, the location of the beginning point of the westerly line of the Dwyer tract first conveyed to Hancox is fixed as being at one hundred and fifty feet from the towpath of the canal, and the westerly line of this tract, as so fixed, practically coincides with the location of the westerly line as shown on the Van Horne and Soper & Brittin maps. As to the location of this westerly line, I reach the same conclusion therefore, upon the evidence relating to the monuments fixed by the Dwyer deeds, conveying one hundred and seventy-five feet to Howe, and I conclude that the first conveyance to Hancox of one hundred and sixty-nine feet on Chapel avenue reserved to Howe, as part of the Dwyer lot of one hundred and seventy-five feet conveyed to Howe, the six feet on the easterly boundary of the lot adjoining the shore. Howe therefore continued to be the shore owner after the conveyance in 1863, by reason of this reservation. Relator shows, by its evidence, that after receiving his title, under the two deeds, Hancox occupied the land to the line of the Palisades, by laying them out and grading and planting trees, and that this exclusive occupation up to this line has since continued. It is therefore claimed that the line of the Palisades must be taken as the easterly boundary of the lot, on the principle of practical location of boundaries. The rules relating to the practical location of disputed boundaries are not, in my judgment, applicable to the case. The evidence as to occupation would have a decisive bearing if the question of title by adverse

possession up to the line of the Palisades were involved, but in this case the adverse possession began not earlier than 1863, and the lease from the state was made in 1881. If, at that time, the defendant was the owner of the record title to the shore, as I have found it to be, then the state, having made the lease to it, as such owner, under the statute, cannot set up any subsequent adverse possession in the relator or others for the purpose of avoiding in equity its own lease, valid when made.

Having reached the conclusion that the relator's record title, as against the defendant, did not extend to the line of the Palisades, but was at least six feet therefrom, it will be unnecessary to comment at length upon the large amount of evidence taken in the case as to the location of the "shore" line at the time of the severance in the title by Howe on July 1st, 1863. It is settled, by the decision of the court of errors and appeals in *Ocean City Association* v. *Shriver, 35 Vr. 550, 557, 560,* that, as between vendor and vendee and those who claim under them, the line of ordinary high tide *at the time of the conveyance* governs upon the question of riparian rights, and that their respective rights as riparian owners, as fixed on the severance of the title, are not affected by subsequent changes in the shore line. Relator claims that ordinary high water came up to the line of the Palisades, except for a small space at the corner adjoining the wharf or dock on Chapel avenue, and many witnesses, including the members of the Hancox family, who lived on the premises from about 1864 or 1865 to 1877, affirm this to have been the reach of the ordinary tides. On the other hand, the sons of Captain Howe, the grantor, who lived in his house north of the avenue, and who were familiar with the property from the time of his purchase (1854) up to 1874, fix the ordinary high-water line from thirty to fifty feet east of the Palisades. They say there was a meadow east of the Palisades and in front of all of it except about twenty feet, where a ravine or gully from the shore reached up to the Palisades. On this meadow salt grass grew, and was, at times, cut and carted away. There is no question, on the evidence of all the witnesses, that the bay has been filling up and becoming shallower at this locality since 1863, and that heavy storms, which, in two cases

at least, tore away part of the bulkhead, have carried away most of the salt meadow or other upland beyond the Palisades, and, except near the corner where the Palisades touches Chapel avenue, the present line of ordinary high water reaches the Palisades for nearly its whole length. The evidence of the witnesses as to the line of ordinary high tide at the location in question is not altogether satisfactory, because its reliability depends altogether on the standard fixed, and the wide variance between the lines of ordinary high tide, as fixed by the different witnesses, shows clearly, I think, that they fix different standards. In my judgment, the existence of solid meadow, which could be driven on and from which grass was cut or soil dug, is entitled to very great weight in fixing the line of the shore. Weighing all the evidence in this case upon this point, I reach the conclusion that the relator has established, by the weight of evidence, that the shore line in 1863 extended east of the then line of the Palisades. It follows, therefore, if this conclusion be justified from the evidence, that, as between Howe and Hancox, the former still continued to be the shore owner after the deed of July 1st, 1863, even if this deed be considered as fixing the easterly boundary of the lot at the then line of the Palisades. In reference to the weight of evidence and burden of proof in cases of this character, it should be further observed that, in actions brought to enforce forfeitures, where the whole title is sought to be avoided, the wrong from which the forfeiture results should be clearly and fully established. Where the purchase-money is also forfeited, this rule, as to the proofs, is applied. *United States* v. *Budd, 144 U. S. 154, 162.*

*Third.* The remaining question relates to the effect of the reservation of the water rights in the deed from Howe to Hancox. At the time of this reservation (July 1st, 1863) the Wharf act of 1851 was the only statute in force regulating the rights of shore owners to occupy lands below high-water mark. This statute gave the right to the shore owner (but to no one else) to dock out to low-water line, and, on license from the freeholders of the county, to dock out beyond low water. The Riparian act of March 31st, 1869, repealed the Wharf act, as to lands on New

York bay, and gave the riparian commissioners power to lease lands under water to any applicant, provided that no grant should be made to any other than the riparian owner until after six months' personal notice to him, and a failure of such owner to apply for the grant on the terms fixed by the proprietors. The effect of this section is to give the shore owner a right of pre-emption, which is, or may be, a valuable privilege. This right of pre-emption is one which appertains to the owner of the shore front as owner, and is not a right of a character which can, so far as the state is concerned, be separated from the ownership of the riparian lands. Merely as between the vendor and vendee of riparian lands, I am not prepared to say that a reservation of this character might not be enforced, in a proper case, by enjoining application to the riparian commissioners or otherwise, in order to make the reservation effective. But the riparian commissioners, as representing the state, have the undoubted right to make the fact of riparian ownership a material circumstance in considering the propriety of the grant and the price to be paid, and to base their policy as to grants and prices on such ownership. Having done so in this case, and the grant being, as appears on its face, made on the faith of the representation of ownership, and its continuance and effect, as against the state, being made conditional on this ownership, the reservation of water rights in the deed of the grantor cannot prevent the state from enforcing its right to avoid the lease. Whether, if the lease is annulled, the defendant, on another application for a lease for the same premises, but not as shore owner, could enforce the reservation against the relator, and, by reason thereof, enjoin it from applying for the lease or interfering with defendant's application, is a question which is not considered or decided.

I will advise a decree dismissing the information, with costs to be paid by the relator.