## NIRDLINGER v. STEVENS.

(District Court, D. New Jersey. December 26, 1919.)

1. JUDGMENT ⬤⇒570(5)—DISMISSAL FOR FAILURE TO PROVE TITLE, NOT RES JUDICATA.

In a suit under 4 Comp. St. N. J. 1910, p. 5399, "to compel the determination of claims to real estate," in which the court is required by the statute to finally adjudge whether defendant has any interest in the property, and to fix and settle the rights of the parties, a decree simply dismissing the bill, on the ground that plaintiff had failed to establish his title, as pleaded, *held* not an adjudication which barred a second suit, in which plaintiff sets up a different title.

2. COURTS ⬤⇒371(2)—FEDERAL COURTS MAY ENFORCE REMEDIES GIVEN BY STATE STATUTES.

A federal court of equity may entertain a suit to quiet title under a state statute, brought by one in peaceable possession, who is without adequate remedy at law.

3. NAVIGABLE WATERS ⬤⇒36(3), 44(3)—BOUNDARY OF STATE LANDS BELOW HIGH-WATER MARK SHIFTS AS HIGH-WATER LINE CHANGES.

The boundary between land owned by the state below high-water line on navigable water and the land of a shore owner is ambulatory, shifting from time to time as the high-water line advances or recedes, due to erosion, reliction, or accretion; and a grantee of the state acquires no greater right, and cannot claim title to land formed by accretion.

4. NAVIGABLE WATERS ⬤⇒44(4)—DIVISION OF ACCRETION BETWEEN RIPARIAN OWNERS.

Where ocean shore lands within a city were conveyed with reference to a survey and plat, their lines running parallel with the streets, accretions along their front *held* properly divisible between their owners by extending the boundary lines between them to the then high-water line.

In Equity. Suit by Samuel F. Nirdlinger against Henry E. Stevens, Jr. Decree for complainant.

George A. Bourgoose, of Atlantic City, N. J., and Robert H. McCarter, of Newark, N. J., for plaintiff.

Wilson & Carr, of Camden, N. J., for defendant.

HAIGHT, Circuit Judge. This suit is primarily instituted under an act of the New Jersey Legislature, entitled "An act to compel the determination of claims to real estate in certain cases, and to quiet the title to the same." 4 N. J. Comp. St. p. 5399. The bill also contains allegations which, it is claimed, bring the suit within the general quia timet jurisdiction of a court of equity, irrespective of the statute. Accordingly it prays for a decree removing a cloud upon the title of the plaintiff to the land in question, alleged to have been created by a certain riparian grant made by the riparian commissioners of the state of New Jersey, for a decree establishing that the defendant has no estate or interest in the land, and for a decree fixing and settling the rights of the parties therein.

Some time prior to the institution of this suit the present plaintiff and a corporation known as the Dewey Land Company, being at that time tenants in common of the land in question, brought a suit in the Court of Chancery of New Jersey under the same statute against the same defendant, and therein sought the same relief in respect to

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

substantially the same property as is sought in the present suit, except that the prayer for relief in the bill in the former suit did not, as does the bill in the present suit, specifically pray for the removal of the before-mentioned alleged cloud upon the title. The former suit was duly prosecuted, and resulted in a decree dismissing the bill. Upon appeal, the Court of Errors and Appeals of New Jersey affirmed the decree of the Court of Chancery. The plaintiff subsequently and prior to the institution of the present suit acquired the interest of the Dewey Land Company.

[1] 1. Naturally the first question which is raised is whether the decree in the former suit is res adjudicata of the issues in the present suit and a bar to the prosecution thereof. In solving that question, the decree actually made and the grounds upon which the same was rested by the respective New Jersey courts must be considered, in connection with the statute under which the bill was filed. This statute was originally passed in 1870 (P. L. 1870, p. 20), and, as is set forth in the title, its purpose is not only to quiet titles, but—

"to compel the determination of claims to real estate in certain cases," viz. those where one is "in peaceable possession of lands * * * claiming to own the same and his title thereto or to any part thereof is denied or disputed, or any other person claims or is claimed to own the same or any part thereof, or any interest therein, or to hold any lien or encumbrance thereon, and no suit shall be pending to enforce or test the validity of such title, claim or incumbrance." Section 1, 4 Comp. Stat.

As is pointed out by Vice Chancellor Stevenson in Fittichauer v. Metropolitan Fireproofing Co., 70 N. J. Eq. 429, 430, 61 Atl. 746, it takes care of—

"those cases of hardship, where the defendant out of possession makes a claim, while the complainant in possession has no means of compelling the defendant, either at law or in equity, to submit his claim for determination, and thus have it either established as valid or finally declared void. The great object of the statute is not to afford the complainant a new means of asserting and establishing his title, but to afford the complainant a means of compelling the defendant to either abandon or establish his title or have it decreed invalid."

As is indicated in the last-quoted remarks, the act provides for those cases where the defendant may disclaim all interest in the land, but provides that, if he shall answer, claiming any interest therein, he shall in his answer specify and set forth the same, as well as the manner in which, and the source through which, it is claimed to be derived. These provisions have been construed by the courts of New Jersey to constitute an answering defendant the real actor in the suit—the plaintiff—so that he must not only set forth in his answer, but must maintain by proofs, any adverse title or claim which he asserts; and the actual complainant in the suit is under no obligation to exhibit his own title until after the defendant has shown his, being required in the first instance to merely establish the jurisdictional facts, viz. that he is in peaceable possession, claiming to own the lands, and that no suit is pending in which the defendant's claim, whatever it may be, can be tested. Fittichauer v. Metropolitan Fireproofing Co., supra; Ocean View Land Co. v. Loudonslager, 78 N. J. Eq. 571, 80 Atl. 471.

In furtherance of the object of the statute, as expressed in its title, it is provided that, when a defendant has answered, setting up his claim, except in cases where either party has applied for the framing of an issue at law and a trial thereof by a jury (with which feature of the statute we are not concerned in this case)—

"the Court of Chancery shall proceed to inquire into and determine such claims, interest and estate, according to the course and practice of that court, and shall * * * finally settle and adjudge whether the defendant has any estate, interest or right in, or encumbrance upon, said lands, or any part thereof, and what such interest, estate, right or encumbrance is, and in or upon what part of said lands the same exists." Section 5.

It is further provided in section 6 that—

"the final determination and decree in such suit shall fix and settle the rights of the parties in said lands, and the same shall be binding and conclusive on all parties to the suit."

The statute, therefore, specifically directs that the final decree in the cause shall (1) finally adjudge whether the defendant has any interest in the property and if so, exactly what it is; and (2) fix and settle the rights of the parties. No other decree is provided for in the statute; nor, except in cases where the complainant has failed to establish the jurisdictional facts of peaceable possession, etc., or something kindred thereto, would any other kind of decree seem to be permissible. In the latter class of cases there must necessarily be, as in practice there has been, I think, a decree simply dismissing the bill. See Steelman v. Blackman, 72 N. J. Eq. 330, 65 Atl. 715, and Oberon Land Co. v. Dunn, 60 N. J. Eq. 280, 47 Atl. 60.

It is thus apparent that in a decision on the merits the ascertainment and settlement of the defendant's interest is the primary and absolutely essential requirement of the statute. The decree of the Court of Chancery of New Jersey in the suit which is set up as a bar to this suit was simply that the complainant's bill be dismissed. No attempt was made to adjudicate the defendant's interest, or to settle the rights of the parties in the land. That decree was merely affirmed by the Court of Errors and Appeals. It was in no respect ordered to be modified or changed. The decree of the Court of Chancery (as appears from the unreported memorandum filed by the Chancellor) was based on the conclusion that, as the defendant asserted a claim based on a riparian grant of the state, made through the riparian commissioners, and as the validity of the grant could not be attacked collaterally, but only by a direct proceeding instituted for that purpose by or in the name of the Attorney General, the bill, which was held in effect to be such a collateral attack, could not be maintained. The Court of Errors and Appeals disagreed with the ground upon which the Chancellor had dismissed the bill, and held that the complainants might maintain their bill "if they have made out their title." Dewey Land Co. v. Stevens, 83 N. J. Eq. 314, 316, 90 Atl. 1040. The Chancellor's decree of dismissal, however, was affirmed, on the ground that the deeds, upon which the complainants relied to establish their title,

conferred, in fact, no title upon them; Mr. Justice Swayze remarking at the conclusion of his opinion:

"We think the complainants fail to establish the title set up in the amended bill. The decree of dismissal must therefore be affirmed."

What, therefore, has the New Jersey decree specifically established and settled? Nothing, it seems to me, but that the complainants in that suit had not established facts sufficient to warrant the relief prayed for in their bill and authorized, by the statute, to be given. It established nothing more, for instance, than it would have established, had the complainants' bill been dismissed because they had failed to establish that they were in peaceable possession of the locus in quo, as in Steelman v. Blackman, supra, or, as in Oberon Land Co. v. Dunn, supra, because the parties had by their own act made it impossible for the court to carry out the direction of the statute and by decree fix and settle the rights of the parties in the lands.

But it is urged on behalf of the defendant that, although the decree did not in form do so, it has actually settled that the defendant's title is superior to that asserted in that suit by the complainants. This contention is based on the proposition that because under the statute, as hereinbefore construed, it was incumbent upon the defendant in the first instance to assert and prove his title before the complainants were called upon to reveal theirs, the Court of Errors and Appeals must have found that defendant's prima facie title, which rested upon the state's riparian grant, was superior to that asserted by the complainants; otherwise, the court would not have affirmed a dismissal of the bill. But this is a non sequitur. It may be that that decision has established a new jurisdictional requirement, viz. that the plaintiff must establish some kind of title to the land in controversy before the defendant is required to set forth and establish his claim, and, in the event of his failure so to do, the court is not at liberty to entertain a bill filed under the statute in question.

On the other hand, its action in merely affirming a dismissal of the bill may have been due to the fact that, upon examining the record, it found that the deeds relied upon by the complainants conferred no title upon them, and, consequently, it adopted a practical and convenient way of disposing of the case, thus rendering it unnecessary for it to determine whether or not the defendant had any interest in the lands, and hence it advisedly merely dismissed the bill; the complainants being treated rather as interlopers, without a shadow of title. That in a suit instituted under the statute in question, if the decree fixing and settling the rights of the parties in the disputed premises is appealed from and is reversed, the Court of Errors and Appeals must direct what decree is to be entered, is recognized by that court in Blackford v. Conover, 40 N. J. Eq. 205, 218, 1 Atl. 16, 7 Atl. 354. If, therefore, the Court of Errors and Appeals in the New Jersey suit had intended to fix the rights of the parties in the land in question, it would have remitted the record to the Court of Chancery, with a direction to enter such a decree as would have fixed those rights as it adjudged them. I would be loath indeed to hold that a decision in

a former case is res adjudicata upon a mere speculation as to what
another court may have meant to decide, especially when its actual
decree or judgment is not in harmony therewith. Nor, in my judg-
ment, is there anything in the opinion of the court, which was writ-
ten by Mr. Justice Swayze (a "concurring" opinion having also been
written by Judge White), which would justify such a conclusion as
defendant contends for.

In approaching the discussion of this point, it seems advisable to
refer briefly to some of the facts. The locus in quo, which for all
practical purposes is the same in this case as it was in the New Jersey
case, is situate in Atlantic City, N. J., and borders on the Atlantic
Ocean. It probably can best be described, and other matters, which it
becomes necessary to hereafter discuss, can best be understood, I
think, by reference to the following diagram, which is made for con-
venience of reference to conform as nearly as possible to that in Judge
White's opinion in the Dewey Land Company Case. It is not drawn
to scale:

The locus in quo is the triangular piece of property lying east of New Hampshire avenue and indicated by the shaded lines. In 1852 the entire tract shown on the diagram was fast land, and was owned by one Robert B. Leeds. In 1856, and apparently after some of the land had been encroached upon by the ocean, he conveyed it to John McClees, describing it as bounding on "the edge of Absecon Inlet." In 1897 McClees conveyed it to the Atlantic City Beach Front Improvement Company, by a description bounding it on the "high-water mark of Absecon Inlet and the Atlantic Ocean." At that time, as appears on the diagram, the land in question was under water; the ocean in the intervening years having moved inward many feet. Whether the land had been lost by erosion or avulsion, I do not at this point attempt to decide. The predecessors in title of both the defendant and the plaintiff acquired their respective titles to the fast land from the Atlantic City Beach Front Improvement Company. In 1900 the immediate predecessor in title of the defendant, William H. Bartlett, who owned the shore front lot marked B on the diagram, procured a riparian grant from the state for the land, then under water, included within the dotted lines shown on the diagram. In 1899 and 1900, respectively, the then upland part of the lot marked D on the diagram was acquired by the plaintiff's predecessors in title from the Atlantic City Beach Front Improvement Company. Since that time, the shore front by reason of accretions has moved much further oceanward, and is now located approximately as shown on the diagram. It is thus apparent that the triangular piece of the lot marked D—the locus in quo—is now fast land, and is within the bounds of the riparian grant to Bartlett.

In 1910 the Dewey Land Company and the present plaintiff, who then were tenants in common of lot D, as before stated, filed the before-mentioned bill in the Court of Chancery of New Jersey against the present defendant to have the latter's interest in the locus in quo determined and settled. In the original bill in that case the complainants claimed title to the locus in quo by reason of accretions. Subsequently, however, they amended their bill, eliminated all claim based on accretions, and rested their title upon quitclaim deeds taken in 1911 from John McClees and in 1912 from the heirs of Robert B. Leeds, respectively. This was apparently done under a mistaken notion of the effect of a decision rendered by the Court of Errors and Appeals of New Jersey in Ocean City Ass'n v. Shriver, 64 N. J. Law, 550, 46 Atl. 690, 51 L. R. A. 425. In the deed from the Leeds heirs, the property was described as running to the high-water mark as it existed in 1852, and in the McClees deed as running to the high-water mark as it existed on April 15, 1853.

It is important that the title asserted by the complainants in the New Jersey suit be borne in mind in ascertaining what the Court of Appeals in New Jersey decided in that suit. As will be seen by reading the opinion of Mr. Justice Swayze (83 N. J. Eq. 316, 90 Atl. 1040) and the opinion of Judge White (83 N. J. Eq. 656, 91 Atl. 934), it was held that neither of these deeds conferred any title upon the complainants to the locus in quo, for the reasons which are very clearly set

forth in Mr. Justice Swayze's opinion. It is entirely clear, both from Justice Swayze's opinion and from Judge White's opinion, that the New Jersey court did not attempt to determine what rights, if any, any of the parties to that suit had acquired in the land in question by reason of accretions, and Judge White distinctly says that the question as to what rights the defendant had acquired in the locus in quo by virtue of the riparian grant was not before the court. What better assurance could there be that the court did not attempt to decide that question? It is true that Justice Swayze said (83 N. J. Eq. 317, 90 Atl. 1042):

"If the land was formerly fast land, and the title was lost by erosion, it became the property of the state, not merely as long as it remained under water, but, if the state made a riparian grant, absolutely. Stevens v. Paterson & Newark Railroad Co., 34 N. J. Law, 532 [3 Am. Rep. 269]. Whatever right the former owners might have as against private persons upon the ocean receding was of no avail against the state's riparian grant; the title lost by erosion was then lost forever, unless it was regained by accretion, and the right of accretion was the compensation of the former owner for his loss; each grantee had the same right."

It was these remarks which called forth the opinion of Judge White. I do not think that they give any warrant for the conclusion that Justice Swayze meant to say that the riparian grant deprived the owner of lot D of such land within the bounds of the riparian grant as might thereafter be formed by accretions, if, in other respects, he would be entitled thereto. It is true that he made a broad statement when he said that "it became the property of the state, not merely as long as it remained under water, but, if the state made a riparian grant, absolutely"; but that statement must be read in the light of what he had just been discussing and what he said afterwards. He had just been discussing, not the effect of the riparian grant, but of the title, if any, acquired by the complainants through the deeds which they had received from John McClees and the Leeds heirs. I think that his remarks had reference to the devolution, as respects these grantors, of the title to the property embraced within the original Leeds and McClees deeds, when it or a part of it became covered with water, and later when it became uncovered by reason of accretions. In the succeeding sentence, Justice Swayze said:

"The title lost by erosion was then lost forever, unless it was regained by accretion."

If this means anything, it is a clear limitation upon the broader statement theretofore made. The case of Stevens v. Paterson & Newark Railroad Co., cited by Mr. Justice Swayze, simply held that the state of New Jersey is the absolute owner of the land under all navigable waters, below the ordinary high-water line, within its limits, and can grant such land to any one without making compensation to the owner of the shore, with the possible exception of the right to "alluvium and dereliction," pointed out in Judge White's opinion in Dewey Land Co. Case. This case did not hold, and in fact the question was not involved, that in making a riparian grant of land under water the state could confer a title upon its grantee which would deprive the owner of the ripa of his right to such accretions as might form in front of

his land, within the bounds of the grant, before the grantee might have filled in or otherwise reclaimed the land thus granted to him. As pointed out in Judge White's opinion, the statute of New Jersey, under which the grant in this case was made, provides:

"That before an independent grantee from the State may fill the land under water in front of the land of a riparian owner who has failed to take out a state grant after notice, such independent grantee must extinguish such riparian owner's right to accretions by paying to him the value thereof, to be fixed by the riparian commissioners, subject to an appeal to the Supreme Court and to a trial by jury." Dewey Land Co. v. Stevens, supra, 83 N. J. Eq. 659, 91 Atl. 935.

Accordingly, it is not to be presumed that Justice Swayze, by the before-mentioned broad statement which he made, considering the circumstances under which he made it, the subsequent apparent limitation, and what was actually decided in Stevens v. Paterson & Newark Railroad Co., intended to lay down as an absolute rule that a riparian grant from the state divested the owner of the ripa, when a different person from such grantee, of his right to land formed by accretions before such grantee had reclaimed the land under water thus granted. This will be more manifest, I think, in the light of the general rules, which will hereafter be discussed, regarding the relative rights of the owner of shore front property and the state and the latter's grantee.

Reverting now to the question of the effect of the New Jersey decree and decision on this suit, as before shown, the determination of whether the defendant has any interest, and, if so, what it is, is the primary and absolutely essential requirement of the statute. A decree or decision which either expressly or impliedly falls short of that requirement necessarily does not dispose of the case on the merits. It is, of course, elementary that, for a judgment in one suit to be a bar to the prosecution of another suit between the same parties or their privies, the point in controversy must be determined on its merits, and if the first suit be dismissed for want of jurisdiction, or disposed of on any ground which did not go to the merits of the action, the judgment rendered will prove no bar to the prosecution of another suit. Hughes v. United States, 4 Wall. 232, 18 L. Ed. 303.

Nor is the practical effect of the decree to bar the present action, because of the rule that a judgment on the merits is res adjudicata, not only as to any matter which was offered to sustain or defeat the claim in controversy, but as to any other matter which might have been offered for that purpose; in other words, I do not think that the fact that the plaintiff in this suit did not assert, with his co-complainant in the New Jersey suit, the title upon which he now relies to defeat the title set up by the defendant, precludes him from now asserting it. That rule has no more application to this case than it would have to a judgment of involuntary nonsuit rendered in an action at law, which is based upon the failure of the plaintiff to establish facts entitling him under the law to relief. Such a judgment, of course, does not preclude the plaintiff from supplying in a subsequent action facts which he might have supplied in the first action, and which would have made out a case entitling him to relief, if not sufficiently answered by the defendant. Manhattan Life Insurance Co. v. Broughton, 109

U. S. 121, 3 Sup. Ct. 99, 27 L. Ed. 878; Beckett v. Stone, 60 N. J. Law, 23, 36 Atl. 880; 23 Cyc. 1136 and cases there cited.

I accordingly conclude that the New Jersey decree is not res adjudicata of the questions in this case. If a contrary conclusion were reached, there would be presented a situation where, although the title or interest of the defendant had never been settled, neither party would ever be able to procure a decree under the statute, setting at rest the title to the land. Indeed, the practical effect would be to confirm the defendant's claim of title to land of which the complainant was and is in peaceable possession, not because it had ever been so decreed by any court, but because in a previous suit the complainant had failed to establish his title. Such a result should, of course, be avoided, if possible.

This conclusion has made it unnecessary for me to consider whether the fact that the bill in the present suit seeks, quite independently of the statute, to remove a cloud upon the title, or whether the fact that the premises in question in this suit do not include a part which was in question in the former suit, viz. the part beyond the present high-water line, has any effect on the question under discussion. As no claim is made in the present suit on account of the deeds upon which the plaintiff and his co-complainant relied in the New Jersey suit, the effect of that decision as respects any question which might have arisen in this case, because of these deeds, need not be considered.

[2] 2. It is conceded that the plaintiff is in peaceable possession of the land in question, claiming to own the same, and that no suit is pending to test the validity of the title or claim asserted by the defendant; consequently the jurisdictional facts required by the statute are present. It is also apparent that the plaintiff is without any adequate remedy at law. As he is in peaceable possession of the land, he cannot institute an action in ejectment, and no suit is pending at law wherein the validity of his title and the claim of the defendant can be tested. Under these circumstances, it is entirely clear that not only has this court jurisdiction to entertain the bill in this suit and thus administer the New Jersey statute, but that it is its clear duty to do so. Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52; Reynolds v. Crawfordsville Bank, 112 U. S. 405, 5 Sup. Ct. 213, 28 L. Ed. 733; Chapman v. Brewer, 114 U. S. 158, 5 Sup. Ct. 799, 29 L. Ed. 83; Wehrman v. Conklin, 155 U. S. 314, 15 Sup. Ct. 129, 39 L. Ed. 167. In all of these cases, statutes in no material respect different from the New Jersey statute were administered in the federal courts. In the last-cited case, it was held that such a state statute could not be administered by a federal court, where the plaintiff had an adequate remedy at law.

[3] 3. I am now brought to a consideration of the case on its merits. Both the plaintiff and the defendant claim to own the locus in quo. The defendant's claim is based both upon the riparian grant from the state and upon accretions to the fast land, of which his predecessor in title was the owner at the time of the riparian grant, and of which the defendant is now the owner. The plaintiff's claim of title is likewise based upon accretions to the upland, of which he and his prede-

cessors in title from time to time have been the owners. He also makes claim under the doctrine pertaining to avulsion. The first question on this phase of the case is whether the riparian grant to the defendant's predecessor in title, in and by itself, has conferred any title on the defendant to the locus in quo, in view of the fact that it is now fast land, and was not reclaimed by the state's grantee before the accretions had formed it. The solution of that question necessitates the ascertainment of the relative rights of the owner of shore front property and the state and the latter's grantee. For all purposes necessary to be considered in this case (there are some differences), the rights of the state of New Jersey to lands under navigable waters are the same as those which before the revolution were vested in the Crown of England; the title to the soil beyond the ordinary high-water line being formerly vested in the crown, and since the revolution in the state. Bell v. Gough, 23 N. J. Law, 624, 633; Stevens v. Paterson & Newark Railroad Co., supra; Paul v. Haselton, 37 N. J. Law, 106; Hoboken v. Pennsylvania Railroad, 124 U. S. 656, 8 Sup. Ct. 643, 31 L. Ed. 543. It was the rule of the common law, as it is the rule in New Jersey and elsewhere, so far as I know, that as the high-water line shifts from time to time, due to erosion, accretion, or reliction, the crown's or state's inland boundary and the outward boundary of the riparian proprietors respectively, shift, so that both are ambulatory, and depend from time to time upon the location of the high-water line. The King v. Yarborough, 3 Barn. & Cress. 91; In re Hull & Selby Railway, 5 M. & W. 328, 131 English Reports (Full Reprint) 139; Camden & Atlantic Land Co. v. Lippincott, 45 N. J. Law, 405; Ocean City Assoc. v. Shriver, 64 N. J. Law, 553, 554, 46 Atl. 690, 51 L. R. A. 425; New Orleans v. United States, 10 Pet. 706, 716, 9 L. Ed. 373; County of St. Clair v. Lovingston, 23 Wall. 46, 23 L. Ed. 59; Gould on Waters, § 165, and cases there cited.

On principle, it would seem to necessarily follow that the state's grantee can acquire no greater rights than the state itself had. If, therefore, the state's inland boundary is ambulatory, and it has no title to lands formed by accretions, its grantee can have none, and must merely acquire a like boundary. The authorities so hold. I am not now speaking of the right of a grantee under the New Jersey statute to fill in and reclaim land under water conveyed to him by the state's riparian commissioners, upon compensating the owner of the upland, because that right rests on, as I take it, an entirely different principle, viz. that of eminent domain. The leading case on this point is Scratton v. Brown, decided by the Court of King's Bench in 1825 and reported in 4 Barn. & Cress. 488. One of the questions in that case was whether a conveyance of certain property, lying between the high and low water marks, acquired originally by the grantor from the crown, conveyed that which from time to time, as the sea encroached upon or receded from the beach, lay between the high and low water marks, or only that which at the time that the deed was made was bounded by the then high and low water marks. It was held that, as the high and low water marks shifted, the property conveyed by the deed also shifted. In the course of his opinion, Judge Bayley said (page 498):

"The question here is whether there may be a certain quantity of land shifting in situation and vesting in the same persons at different times? That must be the case of land fronting the sea or a river, where, from time to time, the sea or river encroaches or retires. If the sea leaves a parcel of land, the piece left belongs to the person to whom the shore there belongs. The land between high and low water marks originally belonged to the crown, and can only vest in a subject as the grantee of the crown. *The crown by a grant of the seashore would convey, not that which at the time of the grant is between the high and low water marks, but that which from time to time shall be between these two termini. Where the grantee has a freehold in that which the crown grants, his freehold shifts as the sea recedes or encroaches.* Then what was the object of the parties to the deed of 1773? To grant the land within certain limits. Those to the east and west were ascertained, but those on the north and south were to be ascertained by the high and low water marks. I think that those words must be construed with reference to the rule of the common law upon the subject of accretion, and that, as the high and low water marks shift, the property conveyed by the deed also shifts."

The above rule and the authority of Scratton v. Brown is approved by the Court of Appeals of New York in Trustees, etc., of East Hampton v. Kirk, 84 N. Y. 215, 38 Am. Rep. 505, as it is also by the Circuit Court for the Southern District of New York in De Lancey v. Welbrock, 113 Fed. 103, in which latter case it was applied in construing a riparian grant of land under water originally made by the British crown and subsequently sold by the state of New York for failure to pay the rents provided for in the grant. The same principle is recognized by the United States Supreme Court in County of St. Clair v. Lovingston, supra. It will be noted that at the beginning of the opinion in that case, 23 Wall. 62 (29 L. Ed. 59) Mr. Justice Swayne said:

"We shall assume, for the purposes of this opinion, that all the title which could be passed by Congress and the state was and is vested in the plaintiff in error."

Scratton v. Brown is cited with approval by the New Jersey courts in Camden & Atlantic Land Co. v. Lippincott, supra, and Ocean City Land Co. v. Shriver, supra, although the precise point now under discussion does not seem to have been involved in either of these cases. Indeed, I think that this rule is recognized by Justice Swayze in the Dewey Land Co. Case, because, as before noted, he said:

"Title lost by erosion was then lost forever, unless it was regained by accretion."

It is expressly adopted by Judge White in his opinion. Consequently, I have no hesitation in reaching the conclusion that if the plaintiff, by virtue of owning lot D, is otherwise entitled to the land formed by accretions within the locus in quo, the riparian grant in question conferred no title thereto on the defendant.

[4] The next inquiry, then, is whether the complainant or the defendant, by reason of being respectively riparian proprietors of the upland, is entitled to the accretions which have formed the locus in quo. On this point the decisive question is how the lines of their respective properties, so far as including accretions is concerned, should run—whether they should follow exactly or approximately the lines of the riparian grant, or whether they should follow lines parallel to New Hampshire avenue.

This question is by no means free from difficulty. The division of lands formed by accretions among coterminous riparian proprietors, and of lands between high and low water marks when the title thereto is not vested in the state, as in Massachusetts, has always been a perplexing question and the subject of considerable discussion in the courts. While I have examined a great many authorities, it would, I think, serve no useful purpose, but would unduly and unnecessarily burden this opinion, to attempt to review them. It is impossible, and the courts have heretofore so recognized, to formulate a general concrete rule by which all cases can be governed, because of the many varying conditions which each case presents. The fundamental principle, however, which underlies all the cases is that the division should be equitable and fair according to the conditions of each particular case. In ascertaining what is equitable in any given case, except possibly in some of that class where the actual or presumed agreement of the parties or their predecessors in title has been considered as the decisive factor (see, for instance, Adams v. Boston Wharf Co., 10 Gray [Mass.] 521, 530), the courts have been primarily governed by the general rule announced by Chief Justice Shaw in Deerfield v. Arms, 17 Pick. (Mass.) 41, 45, 28 Am. Dec. 276, as follows:

"Two objects are to be kept in view, in making such an equitable distribution; one is, that the parties shall have an equal share in proportion to their lands, of the area of the newly formed land, regarding it as land useful for the purposes of cultivation or otherwise, in which the value will be in proportion to the quantity; the other is, to secure to each an access to the water, and an equal share of the river line in proportion to his share on the original line of the water, regarding such water line in many situations as principally useful for forming landing places, docks, quays, and other accommodations, with a view to the benefits of navigation, and as such constituting an important ingredient in the value of the land."

That case was specifically approved by the United States Supreme Court in Johnston v. Jones, 1 Black, 200, 222, 17 L. Ed. 117. While in Delaware, Lackawanna & Western Railroad ads. Hannon, 37 N. J. Law, 276, there was not directly involved the question of the division of alluvion between coterminous riparian proprietors, yet the question which was before the court was for all practical purposes the same. The case was decided in accordance with the same principle; Chief Justice Beasley thus expressing it, viz.:

"It is not probable that any precise formula, applicable to every case, can be devised. The principle to work by is, that when practicable, each owner is to have his full shore front; when this is not practicable, he is to have his ratable part of such front. I do not see how the rule can be further specialized."

In the application of these general principles to particular cases various concrete rules have been adopted. In some cases it was found that inequalities would result if the side lines separating the upland holdings of the various riparian proprietors were extended over the newly formed land, because of the contour of the new shore front, or because of the direction in which the side lines approached the old shore front, and for other reasons; while in other cases it was held that the extension of side lines would divide the new shore front and the newly formed land equitably between the adjoining owners. In still other cases, where the old shore front was in a cove, another

method of division was adopted; and in some cases the lines have been run perpendicular to the old shore front, etc. A collection of the cases will be found in the foot note of 21 L. R. A. 776, and 25 L. R. A. (N. S.) 257. See, also, Gould on Waters, §§ 162, 163.

But there is still another rule (hereinbefore referred to as a possible exception to the general rule), which rests upon and gives effect to the actual or presumed agreement (which may be found from acquiescence or conduct) of the owners (either the present owners or some of their predecessors in title) of the upland as to the boundary lines of lands between high and low water marks, to which they, respectively, are or may become entitled as owners or otherwise. It was upon that ground that the decision of the Court of Chancery of New Jersey in Stockham v. Browning, 18 N. J. Eq. 390, was based. The facts in that case in several important respects are so nearly analogous to the facts in the case at bar as to make the case an important authority. The last-mentioned rule has been most frequently applied by the Supreme Court of Massachusetts in the division of the flats (the shore between high and low water mark) which, under an ancient colony ordinance, belong to the riparian proprietors. Valentine v. Piper, 22 Pick. (Mass.) 85, 33 Am. Dec. 715; Piper v. Richardson, 9 Metc. (Mass.) 155; Drake v. Curtis, reported in a foot note to Curtis v. Francis, 9 Cush. (Mass.) 446; Adams v. Boston Wharf Co., 10 Gray (Mass.) 521; Attorney General v. Boston Wharf Co., 12 Gray (Mass.) 553; Gerrish v. Gary, 120 Mass. 135. See, also, cases cited in Gould on Waters, §§ 162 and 164. It needs no argument to demonstrate that this rule is as applicable to the division of lands formed by accretions as it is to the division of "flats," as in the Massachusetts cases, or the division of the shore front for wharfage purposes, as in the New Jersey case.

It is now necessary to consider some additional facts in light of these general rules. As before noted, all of the lands of the plaintiff and the defendant, as well as all land in that vicinity, was originally fast land. In the years intervening between 1852 and 1870, the ocean had encroached to such an extent that all of the lands of the plaintiff and defendant, and considerably more to the north and west and all to the east were under water. The high-water mark at the last-mentioned year was, on a curving line, at approximately the intersection of Pacific and Vermont avenues. Thereafter the land which had been washed away began to reform. In 1852 all of the property in the vicinity of the locus in quo and for a considerable distance to the west was surveyed, and a map made thereof. Between 1852 and 1854 a street system was laid out on this map and an agreement entered into between the various property owners adopting that street system and dedicating the streets shown thereon to the public. On this map, New Hampshire avenue is shown as extending in a straight line and at right angles to Pacific avenue to the low-water mark of the Atlantic Ocean, further in distance than it actually extends at the present time.

As before stated, John McClees in 1856 had acquired title to a considerable part of the property in the vicinity of the locus in quo, in-

cluding all of the property owned by the respective parties to this suit. In 1858 he conveyed a plot 160'x100', lying approximately midway between Pacific and Oriental avenues, to one Wooton. In this deed the property was described as lying on the south side of New Hampshire avenue, 150 feet from the corner of Pacific avenue, and the various courses were run in accordance with these two avenues. In 1897 McClees conveyed to the Atlantic City Beach Front Improvement Company a part of the land which he had acquired from Leeds, excepting the lot which he had theretofore conveyed to Wooton, by a deed wherein the first course was stated to begin on the southerly side of Pacific avenue, 175 feet east of Vermont avenue, and extending in an easterly direction along Pacific avenue to the land of the Camden & Atlantic Land Company, thence to the edge of Absecon Inlet, thence along the high-water mark thereof and of the Atlantic Ocean to a point 175 feet east of Vermont avenue, and thence north, parallel with Vermont avenue, a certain number of feet to the place of beginning. The Atlantic City Beach Front Improvement Company in turn conveyed a parcel of the then upland to a predecessor in title of the defendant by reference to New Hampshire, Oriental, Atlantic, and Pacific avenues, and made New Hampshire avenue the easterly boundary of the property. That grantee, as well as defendant's immediate predecessors in title, conveyed by like reference to the street system, and by the same easterly boundary. The Atlantic City Beach Front Improvement Company also conveyed to plaintiff's predecessors in title by reference to the same street system, and made New Hampshire avenue the westerly boundary of the property so conveyed, as did likewise each of the plaintiff's subsequent predecessors in title.

New Hampshire avenue is an improved street. Manifestly there is here a clear recognition by the common grantor of the parties to this suit, as well as by McClees, of New Hampshire avenue, as laid down on the original map, as a boundary line between at least two portions of the upland; and in this connection it must be borne in mind that the land conveyed by the Atlantic City Beach Front Improvement Company to the predecessors in title of the plaintiff and defendant, respectively, was alluvial land, some of which had been formed by accretions before the company acquired title from McClees, and some of it afterwards. It seems to me that the case thus falls clearly within the principle of the rule last above mentioned. There are differences, I freely admit, between the facts of the cases heretofore cited to support the rule, and the facts of the case at bar, but none which distinguish them in principle.

Not only do I think that the owners of all of this land, as it existed in 1854, in dedicating New Hampshire avenue as a public street, across the same, to and at right angles to the ocean, divided the land into two parts and thus fixed the natural side lines of accretion gains for these parts, as suggested in Judge White's opinion in the Dewey Land Co. Case, but the subsequent owners, down to and including the plaintiff and defendant, have, by the recognition of New Hampshire avenue as a boundary line, so divided the upland, which in fact had been formed by accretions, as to make it inequitable to adopt any other division

lines for accretion gains. Indeed, to do otherwise would be to fail to give effect to what may be clearly presumed, from the conduct and conveyances of their predecessors in title, was their understanding and intention. In addition, since 1900, there have been recorded some 400 deeds and 200 or 300 mortgages affecting the property in the vicinity of the locus in quo. In all of these, the properties have been described by lines running at right angles to and parallel with the street system, both as respects that which was upland at the time the defendant received his riparian grant, as well as that which has since been formed by accretions.

Moreover, the newly formed land in the vicinity of the locus in quo, has, to a very great extent, been built upon, and large sums of money invested therein. The plaintiff has been assessed and has paid taxes, as well as assessments for improvements, on the locus in quo. It is manifest, therefore, that if it should be held that the respective riparian proprietors are entitled to accretions in accordance, or approximately in accordance, with the lines of their riparian grants (there were riparian grants made at about the same time as the defendant's, both to the west of his land and to the east of the plaintiff's land), a very great confusion in titles would result, and the door be thrown open, in the straightening out of lines, to the making of exorbitant demands on the part of those who would thus be held to own parts of land which has been improved on the assumption that the various riparian proprietors were entitled to accretions on lines parallel and at right angles respectively to the street system. On the other hand, if it be held that accretions should be awarded in accordance with such street system, these difficulties will all be avoided, and a stability given to titles in that vicinity.

I appreciate, of course, that such a holding will result in certain persons holding riparian grants for land under water when they do not own the upland immediately in front thereof. What effect that may have upon the validity of such riparian grants under the New Jersey statutes it is not necessary to determine in this case. Under the rule heretofore adopted, as new land forms hereafter, it is clear the inland boundary of the riparian grant will move oceanward, and thus no practical difficulty will be experienced, at least until some attempt has been made by holders of riparian grants to reclaim the land under water, in ascertaining who is the owner of the land formed by accretions from time to time. It seems entirely clear, therefore, that the land formed by accretions since the riparian grant, or preferably since the Atlantic City Beach Front Improvement Company made its first conveyance to one of defendant's predecessors in title, should be divided in accordance with the street system. If such a course is adopted, and the plaintiff decreed to be entitled to the accretions formed between the easterly line of New Hampshire avenue and a line beginning the same number of feet east of New Hampshire avenue as the easterly boundary line of his original upland (as it was when Atlantic City Beach Front Improvement Company conveyed it) is distant therefrom, and running parallel to New Hampshire avenue, and if the defendant is decreed to be entitled to the accretions formed be-

tween like lines on the westerly side of New Hampshire avenue, it is apparent that each will get approximately an equal share of the newly formed land in proportion to their upland, so far as frontage on the ocean is concerned, each will secure access to the water, and each will have approximately an equal share of the new high-water line of the ocean in proportion to his share of the original line.

Such a division will therefore be fair and equitable under all of the circumstances, and thus, in addition, will comply with the before-mentioned fundamental rules. Whether the riparian proprietors who own lands east of the plaintiff's lands should have the accretions divided among them on lines parallel with New Hampshire avenue, or on lines parallel with Pacific and Oriental avenues, it is not necessary to decide. I merely make this observation because of one of the points made in the brief of counsel for the defendant. It is true that Judge White, in the opinion which he delivered in the Dewey Land Co. Case, seems ot have expressed an inclination to accept for the division of accretion gains the lines adopted by the riparian commissioners in making riparian grants, provided that in any given case it was not shown that such a division would be unfair. But he also indicated, as before stated, that a different conclusion might be reached if it should be found that by the dedicating of New Hampshire avenue, etc., it was inequitable for the state, in making its grant, to have disregarded the lines so fixed. Whether or not the act of the state in disregarding the lines of the streets was inequitable, it is clear, for the reasons heretofore given, that it would be inequitable or at variance with the pre-sumed intention or understanding of the predecessors in title of the respective parties to divide the accretions in accordance with the lines of the riparian grant.

Upon the whole, therefore, I will hold that the plaintiff is entitled to all lands formed by accretions between the easterly line of New Hampshire avenue and a line drawn parallel thereto and distant easterly therefrom the same number of feet as the easterly boundary line of his original upland (as it was when the Atlantic City Beach Front Improvement Company conveyed it) is distant from the easterly line of New Hampshire avenue. This necessarily results in finding that the defendant has no title by reason of accretions to any part of the locus in quo. As I have heretofore found that he has no title thereto by reason of the state's riparian grant, and as his only claim of title is based on the riparian grant and his right to accretions, it follows that he has no right, title, or interest in the locus in quo.

This conclusion renders it unnecessary for me to consider whether the doctrine pertaining to lands lost by evulsion and subsequently regained is applicable to this case, or whether the principle of Banks v. Ogden, 2 Wall. 57, 17 L. Ed. 818, is pertinent.

The plaintiff is entitled to a decree to the above effect, with costs.